**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION**

PHILLIP W. KING and SYLVIA B. KING                                        PLAINTIFFS

vs.                                                                  Civil Action No. 3:03-cv-87WS

SYNTHES (U.S.A.)                                                           DEFENDANT

**ORDER GRANTING SUMMARY JUDGMENT**

Before this court are the following motions: (1) a motion to exclude the testimony of plaintiffs' expert submitted by defendant Synthes (U.S.A.) ("Synthes") **[docket # 44-1]**; (2) a motion for summary judgment offered by Synthes **[docket # 44-2]**; (3) a motion to extend time to respond to defendant's motions to exclude and for summary judgment filed by plaintiffs Phillip W. King and Sylvia B. King ("the Kings") **[docket # 46-1]**; and (4) a motion to extend time for discovery submitted by the Kings **[docket # 51-1]**. For the reasons explained below, this court grants defendant's motions to exclude the testimony of plaintiffs' expert and for summary judgment, and terminates plaintiffs' motions to extend time as moot.

**Pertinent Facts and Procedural History**

On or about November 3, 1999, a tree fell on Mr. King's left arm and resulted in a comminuted fracture of his left humerus. On February 28, 2000, Felix H. Savoie III, M.D. ("Dr. Savoie"), an orthopedic surgeon, placed a Synthes humeral nail ("Synthes Rod") in Mr. King's left arm and secured it with two interlock screws. The Kings contend that the

nail broke in January 2001, and resulted in Dr. Savoie's replacing it with a larger rod on January 24, 2001. The Kings further contend that this second surgery led to Mr. King's arm being infected, which resulted in the second rod being removed and replaced with two additional rods. Because the Kings contend that the Synthes Rod was the genesis of Mr. King's subsequent misfortunes, they filed suit against defendant Synthes in the Circuit Court of Lincoln County, Mississippi, on December 31, 2002.

Synthes removed this action to this federal forum on January 23, 2003. This court has jurisdiction over this dispute pursuant to diversity jurisdiction, Title 28 U.S.C. § 1332.[1] The Kings are each adult resident citizens of Mississippi, and Synthes is a Pennsylvania corporation with its principal place of business there. Additionally, the amount in controversy here exceeds the jurisdictional threshold of $75,000.00, exclusive of costs and interest. Consequently, this court applies the substantive law of Mississippi to this dispute. A district court applies the law of the forum state where the cause of action occurred unless, with respect to some particular issue, some other state has a more significant relationship to the occurrence or to the parties. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S. Ct. 817, 82 L. Ed. 1188 (1938). Neither the Kings nor Synthes disputes that this court has subject-matter jurisdiction over them and this case or that the substantive law of Mississippi applies.

The crux of the motions before the court do not center around the facts articulated above; rather, the gravamen of the argument is whether the Kings' expert can provide

---

[1] Title 28 U.S.C. § 1332(a)(1) provides in pertinent part: "The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . citizens of different States."

2

testimony before a finder of fact. The plaintiffs' only expert, Edward W. Reese, Ph.D. ("Dr. Reese"), professes to be an expert of the rules and regulations of the United States Department of Health and Human Services Food and Drug Administration ("FDA"), as promulgated under Title 21 of the *Code of Federal Regulations*. As he explained in his testimony before this court and as provided in his *curriculum vitae*, Dr. Reese worked as director of technical services for Medtronic, Inc., from 1971 to 1980; as manager of manufacturing operations for Astro-Med, Inc., from 1981 to 1983; and vice president of operations for Angiomedics from 1983 to 1986. These companies were involved in the design and manufacture of medical devices, but none designed or manufactured the systems at issue in the matter *sub judice*. Dr. Reese worked in research and development for these companies, supervised an engineering design department, and performed managerial duties. In 1986, he founded his own company, Genesis Medical, Inc., which advertises itself as a company that "determines if a causal relationship exists between a suspect medical device and the manufacturer, distributor, physician, hospital, and/or patient." Edward W. Reese, *Genesis Medical, Inc.*, http://www.genesismed.com (last visited Oct. 19, 2004).

Dr. Reese earned his undergraduate degree from Metropolitan State University in St. Paul, Minnesota, in 1988, with a major in management. In 1989, he received his masters degree in management from Cardinal Stritch University in Milwaukee, Wisconsin. Additionally, in 1993, he received a doctorate in medical technology studies from the Union Graduate School (now known as The Union Institute) in Cincinnati, Ohio. In testimony before this court, Dr. Reese was asked about his doctoral program, which he

acknowledged was a self-study program that did not have significant course work. Furthermore, Dr. Reese stated that the subject matter of his doctorate was unique and that no institution in the United States offered a traditional program in the area of medical technology studies. Regarding the professional background of the committee that reviewed his doctoral course work, Dr. Reese acknowledged that none had a doctorate in his area of expertise — medical technology studies — and that one of his advisors actually had a background in English.

Dr. Reese has submitted a five-page written opinion in this case, dated April 22, 2004, relying primarily upon documents provided to him by plaintiffs' counsel. Dr. Reese's conclusions are summarized as follows: (1) a design or manufacturing defect of the Synthes Rod likely caused Mr. King's injury and could have been avoided; (2) Synthes' device was mislabeled; (3) Synthes did not adequately test its rod; and (4) Synthes failed to comply with certain FDA regulations.

## Relevant Law and Application

*Expert Testimony*

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), the United States Supreme Court set out the criteria that district courts are to follow in assessing challenged expert testimony offered under Federal Rules of Evidence 702.[2] As the Court stated, "Proposed testimony must be supported by

---

[2]Federal Rule of Evidence 702 reads as follows:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in

appropriate validation — i.e., 'good grounds,' based on what is known. In short, the requirement that an expert's testimony pertains to 'scientific knowledge' establishes a standard of evidentiary reliability." *Id.* at 590. Accordingly, the Supreme Court then held that a trial court has a duty to screen expert testimony for both its relevance and reliability. *Id.* An expert's opinion must have a "reliable basis in the knowledge and experience of his discipline." *Id.* at 592. Specifically, this court must determine that the reasoning and methodology underlying the testimony is scientifically valid and that the reasoning and methodology can properly be applied to the facts in issue. *Id.* at 592–93. Thus, said the Supreme Court, under Rule 703,[3] an expert must base his opinion upon facts and data of a type reasonably relied upon by experts in the field. *Id.* at 595.

Although the Supreme Court has suggested that the *Daubert* standard is a flexible one, the district court should "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of

---

the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

[3]Federal Rule of Evidence 703 reads as follows:

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted. Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect.

intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152, 143 L. Ed. 2d 238, 119 S. Ct. 1167 (1999); *Daubert*, 509 U.S. at 592; *Vogler v. Blackmore*, 352 F.3d 150 (5th Cir. 2003). *Daubert* also instructs the trial court on the procedural mechanics for resolving disputes relative to the expert's competence to testify under the standards enunciated in that opinion. That is, *Daubert* directs that the district court determine admissibility under Rule 702 by following the directions provided in Federal Rule of Evidence 104(a).[4] So, Rule 104(a) requires the trial judge to conduct a preliminary fact finding and to make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592–93.

The party sponsoring the expert testimony has the burden of showing that the expert's findings and conclusions are based upon the scientific method and, therefore, are reliable. "This requires some objective, independent validation of the expert's methodology. The expert's assurances that he has utilized generally accepted scientific methodology is insufficient." *Moore v. Ashland Chemical, Inc.*, 151 F.3d 269, 276 (5th Cir. 1998). "The proponent[s] need not prove to the judge that the expert's opinion is correct, but [they] must prove by a preponderance of the evidence that the testimony is reliable." *Id.*

---

[4]Federal Rule of Evidence 104(a) provides in pertinent part: "preliminary questions concerning the qualifications of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions of subdivision (b)."

In seeking to perform its role as the juridical gatekeeper as envisioned by *Daubert*, this court *sub judice* conducted a preliminary fact-finding session on October 19, 2004, during which time the court heard the testimony of Dr. Reese. As explained, *supra*, Dr. Reese received his Ph.D. in medical technology studies. The defendant does not question his expertise in *this* field; instead, Synthes questions Dr. Reese's methodology in arriving at his ultimate conclusion that Mr. King's injury was attributable to the failure of the Synthes Rod to respond to its design objective intent as established and advertised by Synthes in a safe, effective, and reliable manner.

The court has reviewed carefully Dr. Reese's report. This court is not persuaded that Reese's methodology in reaching his conclusions passes the *Daubert* test. First, Dr. Reese's opinion that a design or manufacturing defect caused Mr. King's injury does not satisfy the Rule 702 standard. Dr. Reese is not a medical doctor nor an engineer. He has no metallurgical training, is not formally trained in the biomechanical, biomedical, or health care fields, and has not, to date, authored any professional publications. Although Dr. Reese has done his best to bolster his experience in medical device design, he conceded that he has not developed product specifications. The court finds that Dr. Reese's knowledge of, and experience with, intra-medullary rods is highly suspect: Dr. Reese has never worked for a company with an intra-medullary product; he failed to address the risks associated with other such devices; and he could not even name other such devices marketed at the same time as the Synthes Rod.

Dr. Reese's methods in formulating his opinions suffers from the same infirmity. Dr. Reese made only a cursory inspection of the Synthes Rod explanted from Mr. King:

7

> Q. Did you ever inspect this nail that was involved in this case?
> A. Yes, I did.
> Q. You held it in your hands?
> A. As I recall, I did.
> Q. Do you recall or not?
> A. Best of my knowledge, I believe I did inspect this nail.
> Q. Did you do any tests on it?
> A. I did a nondisruptive visual examination of the nail. I have, as I have done in many cases involving intramedullary rods and nails.
> Q. When was that?
> A. I'm sorry. I don't recall when that was.
> Q. Did you — you did no destructive testing on it?
> A. Absolutely not.
> Q. You didn't cut it?
> A. No. Absolutely not, sir.
> Q. Did you photograph it?
> A. Not that I recall.
> Q. Did you use a microscope on it?
> A. I may have. I don't recall.
> Q. Do you have a microscope at your lab at Genesis Medical, Inc.?
> A. No, sir, but I have access to microscopes.
> Q. Did you use an electron microscope on it?
> A. No, sir.
> Q. Did you x-ray it?
> A. No, sir.
> Q. Did you test the hardness of it?
> A. No, sir.
> Q. Did you test the microstructure of it?
> A. No, sir. There is no reason for me to do that.

Dr. Reese did not analyze nor test the design of the Synthes Rod, nor did he compare the design features of the Synthes Rod with other intra-medullary rod devices. Additionally, Dr. Reese testified that has requested on several occasions that Synthes provide him information for him to review; yet, he already has rendered a "professional opinion" on whether the Synthes Rod complies with FDA rules and regulations.

> Q. Have you done anything to analyze the manufacturing procedures of the defendant in this case, Synthes?

> A. As I recall, sir, I requested those documents on three or four occasions and have yet to receive that information.
> Q. But you had enough information to render the opinions that Judge Wingate has before him?
> A. I will be happy to defend each one of those opinions, sir.

Since Dr. Reese's opinions fail to cross the threshold for establishing that he qualifies as an expert in this case, this court holds that Dr. Reese is not qualified under Rule 702 to opine on whether an alleged design or manufacturing defect in the Synthes Rod caused Mr. King's injuries.

Next, this court must evaluate Dr. Reese's qualifications to opine on the issue of labeling defects. Dr. Reese claims that the labeling of the Synthes Rod was ineffective in communicating necessary information to the treating physician. Dr. Reese sought to give similar opinions in at least two other federal district courts, both of which ruled that he was not qualified to give medical opinions about device labeling or warnings. *Krueger v. Johnson & Johnson Prof'l*, 2002 U.S. Dist. LEXIS 25943 (S.D. Iowa 2002), *aff'd*, 2003 U.S. App. LEXIS 9779 (8th Cir. May 21, 2003); *Gebhardt v. Mentor Corp.*, 191 F.R.D. 180 (D. Ariz. 1999), *aff'd*, 15 Fed. Appx. 540 (9th Cir. 2001). In particular, it was noted that since Dr. Reese does not have a medical degree, medical training, or surgeon experience, he is not in a position to offer an opinion as to how a warning label might have affected a surgeon's decision to use the device. To date, Dr. Reese has not acquired medical qualifications since the other district court decisions were decided.

In the instant matter, Dr. Reese acknowledged that he has never drafted a label for an intra-medullary system. Dr. Reese did not design an alternative warning in this case or

9

review the labeling of Synthes' competitors. Moreover, Dr. Reese has not spoken with Dr. Savoie, the treating orthopedic surgeon in this case, about the effectiveness of the Synthes Rod labeling and, instead, relies solely upon his own so-called expertise. This court finds that Dr. Reese is not qualified to give expert testimony about the labeling of the Synthes Rod.

Finally, this court must evaluate Dr. Reese's ability to testify regarding Synthes' testing procedures and its compliance with FDA rules and regulations. Dr. Reese alleges generally that Synthes failed to test its intra-medullary device adequately, but he was unable to identify any specific problem or deficiency in the testing. Dr. Reese also stated that Synthes failed to comply with certain FDA regulations. Specifically, Dr. Reese asserted that Synthes neglected to conduct adequate engineering testing of its rod. Although this court need not decide whether Dr. Reese is qualified to give these opinions to enter its ruling today, it decides that he is not. The court finds that Dr. Reese's opinions are based solely upon his interpretation of the definitions provided in the FDA regulations — without evidence that Dr. Reese is qualified to make such determinations[5] — and documentation with which the Kings supplied him. This evidence, without more, is insufficient to establish the Kings' prima facie case. Such testimony does not prove that the Synthes Rod implanted in Mr. King was defective, or that it was a proximate cause of

---

[5]To support his contention that he is qualified to render an expert opinion in this case, Dr. Reese points to an internship he completed at the FDA in connection with his doctoral program. While Dr. Reese attempted to characterize his internship as global in reach by stating that he spent many hours at the FDA library and was not an intern in a particular division, his own C.V. does not support this contention. Dr. Reese's *curriculum vitae* states that he was an intern in the FDA's *Consumer Affairs Division*.

his injuries. Therefore, even if the court were to find that Dr. Reese is qualified to give expert testimony on these issues, its summary-judgment ruling, *infra*, would stand.

The court notes that Dr. Reese's expert testimony has been excluded in several other federal court cases for reasons similar to those described herein. *E.g.*, *Addis v. Zimmer, Inc.*, 2003 WL 22997870 (W.D. Tex. Nov. 12, 2003); *Webster v. Pacesetter, Inc.*, 259 F. Supp. 2d 27 (D.D.C. 2003); *Krueger*, 2002 U.S. Dist. LEXIS 25943, at *1; *Gebhardt*, 191 F.R.D. at 180. Despite Dr. Reese's contentions to the contrary, *see* Affidavit of Edward W. Reese, Ph.D, B.C.F.E., B.C.F.M., C.M.I.-5, at 4, he was, in fact, excluded as an expert witness in *Addis v. Zimmer, Inc.* The court in *Addis* vacated its initial decision to deny the defendant's motion to strike Dr. Reese's expert report[6] and, instead, granted the motion. 2003 WL 22997870, at *2. Dr. Reese's attempts to cloak himself as an expert so as to be able to render a professional opinion in this matter are also unavailing here.

*Summary Judgment*

Defendant Synthes also has asked this court to consider its motion for summary judgment, pursuant to Federal Rule of Civil Procedure 56(c).[7] Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions

---

[6]The court in *Addis* had denied the motion on procedural grounds but reversed itself when it determined that the defendants had indeed followed the prescribed motion procedure.

[7]Federal Rule of Civil Procedure 56(c) provides in pertinent part:

The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

11

on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *Hirras v. Nat'l R.R. Passenger Corp.*, 95 F.3d 396, 399 (5th Cir. 1996) (quoting Fed. R. Civ. P. 56(c)). In ruling on a motion for summary judgment, the court is not to make credibility determinations, weigh evidence, or draw from the facts legitimate inferences for the movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986); rather, "it is the province of the jury to access the probative value of the evidence." *Dennett-Murray Corp. v. Bone*, 622 F.2d 887, 892 (5th Cir. 1980). "Summary judgment can be granted only if everything in the record demonstrates that no genuine issues of material facts exist." *Id*. Summary judgment is improper where the court merely believes it is unlikely that the non-moving party will prevail at trial. *National Stream Serv. Corp. v. Poster Exchange, Inc.*, 305 F.2d 647, 651 (5th Cir. 1962). Facts that are irrelevant or unnecessary to a decision are "non-material" and do not prevent summary judgment. *Anderson*, 477 U.S. at 242; *Phillips Oil Co. v. O.C. Corp.*, 812 F.2d 265 (5th Cir. 1987).

Summary judgment is mandated in any case where a party fails to establish the existence of an element essential to the case and on which the party has the burden of proof. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). Rule 56(c) further requires that the court enter summary judgment if the evidence favoring the non-moving party is not sufficient for the trier of fact to enter a verdict in the non-moving party's favor. *See Anderson,* 477 U.S. at 252; *Exxon Corp. v. Burglin,* 4 F.3d 1294, 1297 (5th Cir. 1993).

When the moving party has challenged the non-movant's case under Rule 56(c), the opposing party must present more than a metaphysical doubt about the material facts in order to preclude the grant of summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U. S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986). In response to a motion for summary judgment, the non-moving party is required to respond with specific proof demonstrating a triable issue of fact as to each of the elements required for establishment of the claim or claims asserted. *Washington v. Armstrong World Indus.,* 839 F.2d 1121, 1122–23 (5th Cir. 1988); that said, the court must resolve all reasonable doubts about the existence of a genuine issue of material fact against the movant. *Byrd v. Roadway Express, Inc.*, 687 F.2d 85, 87 (5th Cir. 1982).

The Kings brought claims of negligence, strict liability, and breach of warranty against Synthes. Plaintiffs must establish several elements to succeed on any of these claims under Mississippi law. Under a negligence theory, by a preponderance of the evidence, the plaintiffs must prove all four elements of this claim: duty, breach, causation, and damages. *Miss. Dep't of Transp. v. Cargile*, 847 So. 2d 258, 262 ¶ 11 (Miss. 2003). To survive a summary-judgment motion in a strict liability cause of action, the Kings must show a genuine issue of material fact as to all the elements of this claim. Miss. Code Ann. § 11-1-63(a);[8] *Wolfe v. Stanley Works*, 757 So. 2d 316 (Miss. 2000).

---

[8]Miss. Code Ann. § 11-1-63 provides in pertinent part:

(a) The manufacturer or seller of the product shall not be liable if the claimant does not prove by the preponderance of the evidence that at the time the product left the control of the manufacturer or seller:

    (i)  1. The product was defective because it deviated in a material way from

Furthermore, a breach of warranty claim requires that a plaintiff offer proof that the

---

> the manufacturer's specifications or from otherwise identical units manufactured to the same manufacturing specifications, or
>
> > 2. The product was defective because it failed to contain adequate warnings or instructions, or
> >
> > 3. The product was designed in a defective manner, or
> >
> > 4. The product breached an express warranty or failed to conform to other express factual representations upon which the claimant justifiably relied in electing to use the product; and
>
> (ii) The defective condition rendered the product unreasonably dangerous to the user or consumer; and
>
> (iii) The defective and unreasonably dangerous condition of the product proximately caused the damages for which recovery is sought.
>
> . . . .
>
> (f) In any action alleging that a product is defective because of its design pursuant to paragraph (a)(i)3 of this section, the manufacturer or product seller shall not be liable if the claimant does not prove by the preponderance of the evidence that at the time the product left the control of the manufacturer or seller:
>
> (i) The manufacturer or seller knew, or in light of reasonably available knowledge or in the exercise of reasonable care should have known, about the danger that caused the damage for which recovery is sought; and
>
> (ii) The product failed to function as expected and there existed a feasible design alternative that would have to a reasonable probability prevented the harm. A feasible design alternative is a design that would have to a reasonable probability prevented the harm without impairing the utility, usefulness, practicality or desirability of the product to users or consumers.

alleged defect caused the injury.  Miss. Code Ann. §§ 75-2-314[9] to -315;[10]  *Farris v. Coleman Co.*, 121 F. Supp. 1014, 1017 (N.D. Miss. 2000).

Without medical expert testimony, the Kings cannot meet their burden.  *Cuevas v. E.I. DuPont de Nemours & Co.*, 956 F. Supp. 1306 (S.D. Miss. 1997) (granting defendant's motion for summary judgment in the absence of medical causation after having ruled that the expert's testimony was inadmissible under *Daubert*);  *Palmer v. Anderson Infirmary Benevolent Ass'n*, 656 So. 2d 790 (Miss. 1995) ("Our general rule is

---

[9] Miss. Code Ann. § 75-2-314 provides in pertinent part:

(1) [A] warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind.

(2) Goods to be merchantable must be at least such as:

   (a) Pass without objection in the trade under the contract description; and

   (b) In the case of fungible goods, are of fair average quality within the description; and

   (c) Are fit for the ordinary purposes for which such goods are used; and

   (d) Run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and

   (e) Are adequately contained, packaged and labeled as the agreement may require; and
   (f) Conform to the promises or affirmations of fact made on the container or label if any.

(3) Other implied warranties may arise from course of dealing or usage of trade.

[10] Miss. Code Ann. § 75-2-315 provides in pertinent part:

Except as otherwise provided in this section, where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is an implied warranty that the goods shall be fit for such purpose.

15

that the negligence of a physician may be established only by expert medical testimony with the exception for instances where a layman can observe and understand the negligence as a matter of common sense and practical experience."). Accordingly, defendant Synthes' motion for summary judgment is granted.

## Conclusion

*Daubert* and its progeny establish the district courts as gatekeepers for the purpose of admitting or excluding opinion testimony. This court simply is unpersuaded that Dr. Reese's testimony is based upon appropriate scientific methodology as *Daubert* commands. Therefore, this court hereby grants defendant's motion to exclude the testimony of Dr. Edward W. Reese. Moreover, pursuant to the teachings of *Celotex* and its companion cases, this court hereby grants summary judgment as to Synthes because the Kings' lawsuit against the defendant cannot survive summary judgment. This court terminates the Kings' motions as moot. The court, in accordance with Federal Rule of Civil Procedure 58 and the local rules, will enter a separate judgment dismissing this case and awarding costs to Synthes.

**SO ORDERED this the 31st day of March, 2006.**

**s/ HENRY T. WINGATE**

**CHIEF UNITED STATES DISTRICT JUDGE**

Civil Action No. 3:03-cv-87WS
Order granting summary judgment